UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT NEEDHAM,

      Plaintiff,      Case Number 04-10149
v.               Honorable David M. Lawson

THE ROHO GROUP,

      Defendant.
_____/

## MEMORANDUM ORDER DENYING PLAINTIFF'S
## MOTION FOR RECONSIDERATION

On February 1, 2007, the Court granted summary judgment for the defendant and dismissed this products liability case. The complaint alleged negligence and gross negligence in the design and manufacture of a seat cushion used by paraplegic wheel-chair-bound individuals, manufacturing defect, and failure to warn, all in one count labeled "Negligence/Gross Negligence/Product Liability." The Court found that the plaintiff failed to produce evidence that the defendant's negligence or a defect in the product caused his injuries because he could not show why the cushion did not suspend his weight on the day in question. The Court denied the plaintiff's late request seeking leave to amend his complaint based on tardiness and futility.

The plaintiff then filed a motion for reconsideration. The Court ordered a response from the defendant, which has been received. Motions for reconsideration may be granted pursuant to E.D. Mich. LR 7.1(g)(1) when the moving party to shows (1) a "palpable defect," (2) that misled the court and the parties, and (3) that correcting the defect will result in a different disposition of the case. E.D. Mich. LR 7.1(g)(3). A "palpable defect" is a defect which is obvious, clear, unmistakable, manifest, or plain. *Mich. Dep't of Treasury v. Michalec*, 181 F. Supp. 2d 731, 734 (E.D. Mich. 2002) (citations omitted). The Local Rules provide that any "motions for rehearing or

reconsideration which merely present the same issues ruled upon by the Court, either expressly or by reasonable implication, shall not be granted." E.D. Mich. LR 7.1(g)(3).

The plaintiff contends that the Court committed error amounting to a palpable defect because it failed to consider an argument that the product was defective due to the lack of a sensor that would have warned the user that he had bottomed out. The plaintiff says that this theory did not require proof of the reason the cushion actually bottomed out, so the Court should have allowed an amendment to the complaint to include that theory to the extent it was not in the original complaint. The defendant responds that this theory was not included in the original complaint, the request to amend is late and would unfairly prejudice the defendant, and it would be futile in all events.

The Court agrees with the defendant. First, the design defect theory premised on the failure to incorporate a bottom-out sensor in the cushion was not part of the plaintiff's original claim. The plaintiff points to the following paragraphs in his complaint as mentioning that theory:

> 9. Defendant Chysalis breached its duties to Plaintiff by, among other things:
> . . . c. manufacturing the cushion and assembling it in such a way that it would foreseeably fail by allowing the flotation to compress without warning under certain conditions, causing the user to "bottom out."
> . . .
> 13. Defendant, because it designed and manufactured the Roho cushion for use by individuals without buttock neurological sensation and with susceptibility to pressure sores, knew or should have known that the dry flotation cushion was defective for its intended use by design, manufacture and/or lack of warning and instruction.

Compl. ¶¶ 9, 13. These paragraphs would not put the defendant on notice of such a claim. It is true that the plaintiff mentioned such a claim in one paragraph of his response to the defendant's motion for summary judgment, filed February 21, 2006. However, the argument section of the response brief does not contain any argument on that claim. Moreover, discovery was already closed by the time the plaintiff's response brief was filed. Discovery closed January 19, 2006. This case was

removed to this Court on June 24, 2004, but the defendant was not on notice of this claim until a year-and-a-half later. Even then, the plaintiff's response brief did not very clearly assert such a claim, as it seemed to be mentioned only in passing, without any argument as to why summary judgment should not be granted on that claim.

The plaintiff does develop this claim in a proposed amended complaint submitted with the motion to amend on April 10, 2006. However, that leads to the second reason for denying reconsideration: allowing a late amendment to include this claim would not be fair to the defendant. The Sixth Circuit has repeatedly concluded that allowing amendment after the close of discovery prejudices the defendant:

> Because the discovery deadline had already passed and the deadline for filing dispositive motions on the issue of immunity was imminent, the defendants would have been prejudiced if a further amendment had been permitted by the district court. *See Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999) ("At least one Sixth Circuit decision has held that allowing amendment after the close of discovery creates significant prejudice, and other Circuits agree.") (citations omitted).

*Miller v. Admin. Office of Courts*, 448 F.3d 887, 898 (6th Cir. 2006). In another case, the court of appeals concluded that the "Defendant would have been unduly prejudiced by yet another amendment to Plaintiff's complaint. First, Plaintiff sought leave to amend after all significant discovery had been completed and after the dispositive motion cut-off date." *Inge v. Rock Fin. Corp.*, 388 F.3d 930, 938 (6th Cir. 2004). The *Inge* court cited *Wade v. Knoxville Util. Bd.*, 259 F.3d 452, 459 (6th Cir. 2001) (affirming denial of leave to amend sought a year-and-a-half after filing of complaint because of "significant prejudice to the defendant"; the dispositive motion deadline had passed, the defendant had filed a motion for summary judgment on all claims alleged in the original complaint, and significant discovery already had been completed); *Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 306-07 (6th Cir. 2000) (upholding denial of leave to amend complaint

where amendment was sought more than a year after original complaint was filed, summary judgment had been granted to Defendants two months earlier, and plaintiff was attempting to add a new legal theory); and *Troxel Mfg. v. Schwinn Bicycle Co.*, 489 F.2d 968, 971 (1973) (holding that district court did not abuse its discretion in denying leave to amend because the plaintiff had proceeded upon one theory through the Court of Appeals where it lost and wanted to repeat the cycle again by alleging a new theory of recovery; finding that cost to defendant of having to defend against new theory was sufficient prejudice). Courts have even found that "amendment on the *eve* of the close of discovery would be prejudicial to defendants and unduly delay trial." *Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792, 806 (6th Cir. 2005) (emphasis added). The Court does not believe that denying the plaintiff's motion for leave to inject a new theory of liability at this late stage of the litigation amounted to palpable error.

Third, there is no clear proof that the plaintiff would be able to establish the claim he now seeks to add. Michigan requires the following proofs in a design defect case:

> [A] prima facie case of a design defect premised upon the omission of a safety device requires first a showing of the magnitude of foreseeable risks, including the likelihood of occurrence of the type of accident precipitating the need for the safety device and the severity of injuries sustainable from such an accident. It secondly requires a showing of alternative safety devices and whether those devices would have been effective as a reasonable means of minimizing the foreseeable risk of danger. This latter showing may entail an evaluation of the alternative design in terms of its additional utility as a safety measure and its trade-offs against the costs and effective use of the product.

*Reeves v. Cincinnati, Inc.*, 176 Mich. App. 181, 187-88, 439 N.W.2d 326, 329 (1989). The plaintiff must show that the manufacturer's design choice "renders the product defective, i.e., whether a risk-utility analysis favored an available safer alternative." *Gregory v. Cincinnati, Inc.*, 450 Mich. 1, 11, 538 N.W.2d 325 (1995). To accurately evaluate a design choice, the jury must weigh the competing

risk-utility factors and consider the alternatives and risks faced in making the design choice. The "risk-utility" test requires that the trier of fact "consider the alternatives and risks faced by the manufacturer to determine whether in light of these the manufacturer exercised reasonable care in making the design choices made." *Prentis v. Yale Mfg. Co.*, 421 Mich. 670, 688, 365 N.W.2d 176 (1984). Federal courts applying Michigan's test have restated it as requiring the plaintiff to produce evidence showing:

> (1) that the severity of the injury was foreseeable by the manufacturer;
> (2) that the likelihood of occurrence of her injury was foreseeable by the manufacturer at the time of distribution of the product;
> (3) that there was a reasonable alternative design available;
> (4) that the available alternative design was practicable;
> (5) that the available and practicable reasonable alternative design would have reduced the foreseeable risk of harm posed by defendant's product; and
> (6) that omission of the available and practicable reasonable alternative design rendered defendant's product not reasonably safe.
> Our review of the district court's formulation convinces us that its restatement of Michigan law was correct.

*Hollister v. Dayton Hudson Corp.*, 201 F.3d 731, 738 (6th Cir. 2000). The elements must be proven through expert testimony. *Lawrenchuk v. Riverside Arena, Inc.*, 214 Mich. App. 431, 435-36, 542 N.W.2d 612, 614-15 (1995) (holding that the "plaintiff must produce expert testimony demonstrating that the [defect complained of] constituted an unreasonable risk" and "in the absence of expert testimony, the trial court properly granted summary disposition for defendant").

The plaintiff relies heavily on a deposition of Winfield Matsler taken in another lawsuit against the defendant as furnishing proof of the elements of the plaintiff's new design defect theory. However, the Court finds that testimony lacking because Matsler never says that a reasonable alternative design incorporating a reliable sensor was available in 1997 when the accident cushion was manufactured and distributed in this case. Rather, Matsler testified that although he worked on

a bottom-out sensor for the cushions in 1985, he said that only conceptual models of a sensor alarm were available before 2000. In Matsler's words:

> Q. And tell me how the project went back in 1985. What was the concept?
> A. . . . I do recall developing something in '86 I'm guessing of a crude working conceptual model. . . . So if the person bottomed out, the foam would then collapse, making the two contacts creating an electrical circuit to a warning device, a buzzer like.
> Q. A buzzer. And that would alert the user or his attendants or family that he had bottomed out?
> A. That's correct.
> Q. And when you come up with this – or did this thing work?
> A. Yes, it did.
> Q. And was it reliable?
> A. This particular – it was a conceptual working model. By – what I mean by that, it was just an experiment. So I would say no, at that stage. At that point of the project it wasn't production ready or a – a product for that matter. So no, I don't think it would be.
> Q. But it was something that worked for you?
> A. It proved a concept. It proved that it could be a lead to a development.
> . . .
> Q. Did this system work to alert the user that his cushion bottomed out?
> A. From my early conceptual working model it did, yes.
> Q. What did Mr. Graebe have you do after you got to this state?
> A. Work on an alternative bottom-out sensing system.
> . . .
> Q. How did these devices work in the plan when you were working with them? Did they warn of bottoming out?
> A. They – yeah, yeah.
> Q. Were they reliable?
> A. I think my – the latest effort that I had was very reliable.
> . . .
> Q. And did ROHO then go to the trouble of having a patent search conducted in it?
> A. Yes.
> Q. And what was the result of the patent search?
> A. The patent search revealed Bill Graebe's invention.
> . . .
> Q. Did your – all your work on this type of a device then get shelved?
> A. Yes.
> . . .
> Q. And when you came to that conclusion that it looked like this finally was feasible, did the design that you had in mind conflict in any way with what Bill Graebe had on the market?

> A. No.
> Q. So you had – by the end of 2000 you have what you believe to be something that was reliable, functional, correct?
> A. Yes.

Pl.'s Supp. Br. [dkt # 214] Ex. 4, Matsler Dep. at 9-10, 14, 23, 40-41, 63.

This testimony is in harmony with that of Otto Roberts, the defendant's vice president of market development, who said that no practical and available bottom-out sensor alert was in existence at the time the plaintiff's cushion was manufactured in 1997, and the company tried to create such a product, but "It didn't work."

> A. [We] [p]rototyped one about three or four years ago. And didn't, didn't work. . . . It was basically a pressure differential product. And I was not intimately involved with it but I did get to see it. I did get to play with it. You could fool with it. And, again, we had a battery life problem. And again, under advice, we looked at it and said that it does not and cannot replace the hand check.
> . . . Well, [the insurance company] said that – is it better than the hand check. We went no, absolutely not better than the hand check. They said, we recommend you don't do it. . . . It didn't work most of the time.
> Q. Really. How much did it cost to produce? Do you know?
> A. About $195.

Def.'s Resp. Ex. A, Roberts Dep. at 161-63. William Graebe, the brother of Roho founder Robert Graebe, testified that he was unaware of any type of sensor alert available in 1997.

> Q. Well, are you aware of anybody in 1997, let's say March '97 and before, that had some type of audible alarm for bottoming-out alarm for cushion for wheelchair back in – at that time period March 1997?
> A. No.

Def.'s Resp. Ex. B, W. Graebe Dep. at 65. Even Winfield Matsler himself, who was a former Roho employee, testified that he worked on conceptual models for a bottom-out sensor, but the concept was not turned into a prototype until 2000, three years after the plaintiff's cushion was manufactured and sold. Matsler now works for Roho's competitor where he continues to try to develop such a sensor. When he was deposed in 2006, he had still not developed such a device.

> Q. . . . [W]hen you got to the end of 2000, you finally had a confidence level that you had overcome the reliability challenges, is that correct?
> [objection]
> A. Correct.
> Q. Finally with regards to what you finally came to believe to be a dependable reliable system, has Star implemented that system in any of its cushions?
> A. No.
> . . .
> Q. . . . And then what happened is by the time you finally got to October of 2000 you felt you had put something together that was simpler –
> A. Oh.
> Q. – but still reliable, correct?
> A. Yes. Well–and that was because I was in a prototype stage. The first time ever I got to that point was in 2000. It was never, never come to prototype stage prior to that. It was all conceptual models.
> A. And those conceptual models for one reason or another broke down in the analysis, is that correct?
> A. Or did not meet specification.

Def.'s Resp. Ex. B, Matsler Dep. at 154, 158.

In addition, none of the plaintiff's experts, Kyle Hamilton, Dr. Lorna Middendorf, and Dr. Robert M. Felton, are engineers, and they did not provide any opinion regarding the design defect theory based on the lack of a bottom-out sensor. Kyle Hamilton is a geriatric physical therapist, not an engineer. Dr. Middendorf testified,

> Q. But you feel you are qualified to provide opinions regarding whether the Roho cushion was properly designed?
> [objection]
> A. No, I would not.
> . . .
> Q. Okay. If you're going to provide testimony concerning the designs its going to be related to warnings, instructions and ergonomics?
> A. Yes. That's what I was asked to do.
> . . .
> Q. Okay. Do you know anything about any more information regarding this proposed component [alert or warning device]?
> A. No.
> . . .
> Q. And just for clarification . . . you don't know how much that this component, this alert warning component would add ROHO the cost to the product?

-8-

>     [objection]
>     Q. So whether it would be cost-prohibitive or not, you don't know?
>     A. Yes. I do not know.

Def.'s Resp. Ex. D, Middendorf Dep. at 29, 82-83. Dr. Felton testified that he did not believe anyone manufactured a cushion with an alert in 1997:

>     Q. Would it have been feasible that one could be put to the Roho cushion?
>     A. Absolutely. A light, a bell, a whistle, a horn, some indication, yeah.
>     Q. Why?
>     A. There should have been because of the fact that you're relying on some kind of device that would alert you that there would be changes to the product when you're sitting on it. It could be a light. It could be something very simple, non-mechanical, non-electrical, it could be – there could be many, many different things out there that if they explored it it could provide a warning.
>     Q. Are you aware of any manufacturers in 1997 that supplied a warning-type device with their cushions?
>     [objection]
>     A. No.
>     Q. Do you know what it would cost to equip a high profile cushion with some type of warning or backup device?
>     A. What it would cost? No, I would not.

Def.'s Resp. Ex. D, Felton Dep. at 170-71.

Based on the evidence submitted in support of the reconsideration motion papers, it appears that there was no reasonable alternative bottom-out sensor design available in 1997 when the plaintiff bought his cushion. Even if there were, the plaintiff has presented no evidence that such a design was practicable or that the absence of such a sensor made the cushion not reasonably safe. Although the plaintiff may have gotten a pressure sore while using the cushion, that fact alone does not make the cushion not reasonably safe. It appears that pressure sores are a common problem known to paraplegic and quadriplegic persons. The fact that the cushion does not eliminate that risk completely does not make the product not reasonably safe, and the plaintiff has submitted no

evidence on this issue. Therefore, the Court's conclusion that the proposed amendment to the complaint was futile does not constitute a palpable error warranting reconsideration.

The Court finds that the plaintiff has not established grounds justifying reconsideration or alteration of the Court's prior opinion and order granting the defendant's motion for summary judgment.

Accordingly, it is **ORDERED** that the plaintiff's motion for reconsideration [dkt # 223] is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: July 27, 2007

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 27, 2007

s/Felicia M. Moses
FELICIA M. MOSES